**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**West Palm Beach Division**

Case No.:

MATTHEW J. HIGHT,

        Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, UNITED
STATES COAST GUARD and Admiral
KARL L. SCHULTZ, Commandant, in his
official capacity,

        Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE
ADMINISTRATIVE PROCEDURE ACT AND, SEPARATELY, THE
DECLARATORY JUDGMENT ACT**

---

## INTRODUCTION

1. Captain Matthew Hight wants to earn an honest living navigating ships on the St. Lawrence River and Lake Ontario. After several years of training he thought he was set to do just that. But then the United States Coast Guard robbed him of that future by ignoring and misinterpreting its own regulations; delegating its licensing power to a private, self-interested business; and requiring him to join that business.

2. This complaint concerns a complicated area of administrative law. But at its core is a very simple principle: the government cannot allow a private business to dictate who can work in an occupation. Because the Coast Guard has done exactly that,

Captain Hight now comes before this Court to request a fair opportunity to obtain the credentials he needs to pursue his calling.

## PARTIES

3. Plaintiff Matthew J. Hight is a citizen and resident of Palm Beach County, Florida. Captain Hight has more than two decades of experience sailing large commercial ships. Now, he wants to use his substantial experience to pilot ships on the Great Lakes and St. Lawrence River for a living.

4. Defendant U.S. Coast Guard is a federal agency headquartered in Washington, D.C. that operates under Defendant U.S. Department of Homeland Security during peacetime. The Coast Guard, through the Great Lakes Pilotage Division of its Office of Waterways and Ocean Policy, manages the processes and procedures for pilot registration on the Great Lakes, including part of the St. Lawrence River.

5. Defendant Commandant Karl L. Schultz is being sued in his official capacity as the officer responsible for the administration of the Coast Guard's Great Lakes Pilotage program and proceedings.

## JURISDICTION

6. This Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 2201 and 5 U.S.C. § 704.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff resides in Delray Beach, Florida and no real property is involved in the action.

**FACTS**

**Captain Hight is an Experienced Mariner**

8.  Captain Hight graduated from Maine Maritime Academy with a major in Nautical Science and a minor in Business Management.

9.  Upon graduating from Maine Maritime Academy, Captain Hight began sailing on international vessels as a third mate. He worked his way up the ranks and eventually sailed for eight years as a master (that is, the captain in command of the vessel).

10. In 2015, after 20 years of being gone at sea for long periods, Captain Hight applied to become a pilot on Lake Ontario and the St. Lawrence River. This way he could apply his substantial sailing experience to earn a living while remaining closer to his family and home by not being at sea for months at a time.

**Pilots Navigate Ships on Local Waters**

11. Although today the word "pilot" often refers to someone who flies an airplane, the word originally meant—and still also means—someone who takes control of a ship when it comes into port or goes through particularly challenging coastal waters.

12. The pilot combines his seafaring experience with a specialized knowledge of local waters, to assist and advise the captain to safely navigate the vessel.

13. In most major ports, the law requires that the captain of a ship allow a local pilot to actually guide the ship.

14. Because pilots need the skill of a captain, but also remain in one region to ply their trade, the occupation is highly sought after and often considered the pinnacle of a mariner's career.

### Registered Pilots are Required on the Great Lakes

15. The St. Lawrence Seaway, which was completed in 1959, is a system of locks, canals, and channels along the St. Lawrence River in Canada and the United States which permits large oceangoing vessels to reach the Great Lakes from the Atlantic Ocean.

16. The shipping season on the St. Lawrence Seaway usually goes from April to December of each year, because the winter weather often renders parts of the seaway unnavigable.

17. The Great Lakes Pilotage Act of 1960 (the "Act") regulates international shipping on the Great Lakes, which is defined to include the relevant part of the St. Lawrence River. 46 U.S.C. §§ 9301-9308.

18. Under the Act, all U.S. vessels operating on register (that is, engaged in foreign trade) and foreign vessels must, with some exceptions, engage a "Registered Pilot" to direct the navigation of the vessel in waters of the Great Lakes designated by the President, commonly called "designated waters." In practice, the Act generally only applies to non-Canadian foreign vessels.

19. The St. Lawrence River has been designated by the President, so only Registered Pilots may direct the navigation of foreign vessels on the St. Lawrence River.

20. In undesignated waters of the Great Lakes, all foreign vessels must, with some exceptions, engage a "Registered Pilot" to be on board and available to direct the navigation of the vessel at the discretion of the vessel's master.

21. Lake Ontario is a part of the Great Lakes but its open waters have not been designated by the President, so a Registered Pilot need not direct the navigation of foreign vessels on Lake Ontario. However, a Registered Pilot must still be aboard and available to direct the navigation of the vessel.

22. Captain Hight wishes to serve as a Registered Pilot on the "District One" waters of the Great Lakes, which consists of the St. Lawrence River and Lake Ontario.

### The Coast Guard Regulates Pilot Registration

23. Under the Act, the Coast Guard is responsible for setting the requirements to become a Registered Pilot. 46 U.S.C. § 9303.

24. Under the Act, the Coast Guard "may authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services." 46 U.S.C. § 9304(a). The Coast Guard is responsible for regulating such pilotage pools. *Id.* § 9304(b).

25. The Great Lake Pilotage Division of the Coast Guard's Office of Waterways and Ocean Policy manages the processes and procedures for pilot registration on the Great Lakes, including the St. Lawrence River and Lake Ontario.

26. The current Director of Great Lakes Pilotage (the "Director") is Todd Haviland.

27. Todd Haviland was the Director during the events described in this complaint.

### The Pilot Registration Requirements Relevant to this Dispute

28. The regulations promulgated by the Coast Guard that describe the requirements for an individual to qualify as a Registered Pilot are listed at 46 C.F.R. § 401.210(a).

29. For an individual to qualify as a Registered Pilot "[t]he individual [must hold] a license or [a merchant mariner credential] endorsed as a master, mate, or pilot, issued under the authority of the provisions of Title 52 of the Revised Statutes, and [must have] acquired at least twenty-four months service as a licensed or credentialed officer or comparable experience on vessels or integrated tugs and tows, of 4,000 gross tons, or over, operating on the Great Lakes or oceans." 46 C.F.R. § 401.210(a)(1). Further, "[t]hose applicants qualifying with *ocean service* must have obtained at least six months of service as a licensed or credentialed officer or comparable experience on the *Great Lakes*." *Id.* (emphasis added).

30. To qualify for registration as a Registered Pilot for waters in which a pilotage pool is authorized, such as in District One, an individual must also comply with the three requirements set forth in 46 C.F.R. § 401.220(b), as required by 46 C.F.R. § 401.210(a)(8).

31. The first requirement under 46 C.F.R. § 401.220(b) is that an applicant pilot must complete a minimum number of trips prescribed by the Coast Guard over the waters for which application is made on oceangoing vessels in the company of a Registered Pilot within one year of applying for registration (the "Minimum Trips Requirement").

32. The Coast Guard has prescribed that an applicant holding a master's license or endorsement, like Captain Hight, must complete a minimum of five round trips over the waters for which registration is required to satisfy the Minimum Trips Requirement. 46 C.F.R. § 402.220(a)(1).

33. The second requirement under 46 C.F.R. § 401.220(b) is that an applicant pilot must complete a course of instruction prescribed by the association authorized to establish the pilotage pool (the "Course of Instruction").

34. The third and final requirement under 46 C.F.R. § 401.220(b) is that an applicant must satisfactorily complete a written exam prescribed by the Coast Guard (the "Written Exam").

35. The other requirements for becoming a Registered Pilot, listed in 46 C.F.R. § 401.210(a), such as the requirement that the individual be younger than 70 years old, are not material to this dispute and need not be repeated here.

36. Once an applicant completes the Minimum Trips Requirement, the Course of Instruction, and the Written Exam described in 46 C.F.R. § 401.220(b), the pilot association authorized to establish a voluntary pilotage pool in which the applicant qualifies for registration must "submit to the Director in writing its recommendations together with its reasons for the registration of the Applicant." 46 C.F.R. § 401.220(c).

37. Subject to the foregoing, a pilot found to be qualified shall be issued a certificate of registration valid for a term of five years and is thereby a Registered Pilot. 46 C.F.R. §§ 401.220(d), 401.110(a)(8).

38. The Director may also, when necessary to assure adequate and efficient pilotage service, issue a "temporary certificate of registration" for a period of less than one year to any qualified person regardless of age. 46 C.F.R. § 401.220(e). This is an exemption from the requirement that a Registered Pilot be younger than 70 years old.

39. To summarize, for an applicant with Captain Hight's experience to qualify to become a Registered Pilot in District One, the applicant would need to obtain six months of experience on the Great Lakes, satisfy the Minimum Trips requirement by completing five round trips over District One waters in the company of a Registered Pilot within one year of applying, complete the Course of Instruction, and satisfactorily complete the Written Exam. Once the applicant qualifies for registration, the pilot association in District One would need to submit its recommendation to the Director. The Coast Guard must then register the applicant if the applicant is found to be qualified.

### The Saint Lawrence Seaway Pilots' Association

40. The Saint Lawrence Seaway Pilots' Association (the "Association") is a private association of Registered Pilots that operate in District One.

41. Pursuant to Section 9304(a) of the Act, the Coast Guard has authorized the Association, as a "voluntary association of United States registered pilots," to form a pilotage pool for District One.

42. The Association is the only association approved to form a pilotage pool for District One.

43. The Association is also a private, for-profit business organization.

44. The Association has fewer than 20 members.

45. The Association maintains sole authority over who may become a member.

46. The Association may deny membership to even the most qualified pilot for a wholly arbitrary reason.

47. To join the Association, a new member must "buy in" by purchasing one share of stock in the Association's business arm, a corporation called Seaway Pilots, Inc.

48. The price of each share of stock in Seaway Pilots, Inc. is equal to the value of the corporation's assets divided by the number of members in the Association.

49. A share of stock in Seaway Pilots, Inc. currently costs close to $200,000.

50. The Coast Guard allows the Association to manage District One's "tour de role." A "tour de role" is an ordered list of available pilots from which pilots are dispatched to vessels requiring pilotage services.

51. A pilot cannot work in District One unless his name is listed on the tour de role, even if he is registered.

52. As the association authorized to establish a pilotage pool in District One, the Association is responsible for prescribing the Course of Instruction described in 46 C.F.R. § 401.220(b) for applicants seeking to become Registered Pilots in District One waters.

53. As the association authorized to establish a pilotage pool in District One, the Association must submit to the Director of Great Lake Pilotage in writing its recommendations together with its reasons for the registration of applicants seeking

registration on District One waters who have qualified for registration under 46

C.F.R. § 401.220(b) by completing the Minimum Trips Requirement, the Course of

Instruction, and the Written Exam.

### The Association's Lake House

54. The price of a share in the Association—which is the value of the Association's

assets divided by its number of members—recently spiked when the Association

purchased some expensive waterfront property to use as its headquarters.

55. The property consists of two adjacent parcels located at the mouth of the St.

Lawrence River in Cape Vincent, N.Y. that the Association purchased for a total of

$1,073,000 in 2016.

56. The property includes a 3,700 square foot building with four bedrooms and two

bathrooms (the "Lake House").

57. The Lake House replaced the Association's previous headquarters, a double-wide

trailer in Cape Vincent recently assessed at $227,200, which it had used as a

headquarters for decades and which it still owns.

58. The Association purchased the Lake House with a windfall it gained after the

Director of Great Lake Pilotage, Todd Haviland, approved a flawed rate-setting

methodology for the 2016 shipping season that allowed the Association to

significantly increase the rates it charged the vessels. (The United States District

Court for the District of Columbia later held that the rate-setting methodology was

arbitrary and capricious in *American Great Lakes Port Ass'n v. Zukunft*, 296 F. Supp. 3d

27 (D.D.C. 2017).)

### The Association's Training Plan

59. The Association has developed an Applicant Pilot Training Plan (the "Training Plan," attached as Exhibit A) that, according to the Training Plan, all applicants must complete "prior to being considered for full registration as a U.S. Registered Pilot."

60. The Coast Guard treats the Training Plan as the Course of Instruction described in 46 C.F.R. § 401.220(b) that all applicants seeking to become Registered Pilots in District One waters must complete.

61. The Coast Guard has approved the Training Plan even though it directly conflicts with the Coast Guard's own regulations governing pilot registration and instruction (*see infra* ¶¶ 80-92).

62. The Training Plan is designed to take several years to complete.

63. The Training Plan is divided into an "Applicant Pilot Training Phase" and a "Deputy Pilot Training Phase," each of which must be completed to satisfy the Training Plan.

64. During the first phase of the Training Plan, the Applicant Pilot Training Phase, each applicant pilot must complete several training trips in the company of a Registered Pilot, who must fill out an Evaluation Card evaluating the applicant. The applicant pilot is responsible for recording the trips as they are completed.

65. The Training Plan states that the "[Association's] Training Committee will inform the Applicant Pilot of exactly what requirements the Applicant Pilot will have to meet." Ex. A, p. 22, ¶ 4.

66. During the Applicant Pilot Training Phase, the applicant pilot must "meet the registration requirements found in 46 CFR 401.210, 402.210, and 402.220," which includes the requirements listed in 46 C.F.R. § 401.220(b), which includes the Minimum Trip Requirement. Ex. A, p. 2, ¶ 9.

67. In addition, the applicant pilot must complete a number of round trips into and out of multiple ports in District One and must complete at least ten trips with tug assistance in one or more of the named ports.

68. When an applicant successfully completes the Applicant Pilot Training Phase, the applicant "is advanced to Deputy Pilot status" and must complete the second phase of the Training Plan, the Deputy Pilot Training Phase. Ex. A, p. 6, ¶ 1.

69. When an applicant advances to the Deputy Pilot Training Phase, the Association "must recommend the Applicant Pilot for Temporary Registration as a Deputy Pilot in accordance with the provisions set forth in 46 CFR 401.220(c)." Ex. A, p. 6, ¶ 22.

70. The Deputy Pilot Training Phase is designed to last approximately two shipping seasons.

71. During the Deputy Pilot Training Phase, the applicant pilot "will usually work alone in the undesignated waters" of District One (that is, Lake Ontario) and continue to make training trips in the designated waters of District One (that is, the St. Lawrence River). Ex. A, p. 6, ¶ 2.

72. The applicant pilot shall "continue … to meet the registration requirements found in 46 CFR 401.210, 402.210, and 402.220," which includes the requirements listed in 46 C.F.R. § 401.220(b), which includes the Minimum Trip Requirement. Ex. A, p. 4, ¶ 9.

73. When an applicant satisfactorily completes the Deputy Pilot Training Phase the applicant "will be recommended for registration as a U.S. Registered Pilot." Ex. A, p. 7, ¶ 10.

74. In both phases of the Training Plan, the "Training Committee shall submit to the [Association's] Board of Directors a semiannual performance report by August 15th and January 15th of each year." Ex. A, p. 5, ¶ 17; *id.* at p. 7, ¶ 5.

75. In both phases, the "Training Committee will give a copy of the performance report to the Applicant Pilot." *Id.* p. 6, ¶ 20; *id.* at p. 7, ¶ 8.

76. In both phases, the "Training Committee's performance report will also be filed in the training records for each Applicant Pilot that are kept by the Training Committee." *Id.*

77. In both phases, the "[Association's] Board of Directors shall forward the semiannual performance review … to the Director of Great Lakes Pilotage by August 30th and January 31st of each year." *Id.* p. 6, ¶ 21; *id.* at p. 7, ¶ 9.

78. In both phases, the "Training Committee shall submit to the [Association's] Board of Directors … any documentation concerning any trips made in accordance with [the Minimum Trips Requirement]." *Id.* p. 5, ¶ 17; *id.* at p. 7, ¶ 4.

79. In both phases, the Association may not terminate the applicant pilot "without the concurrence of the Director [of Great Lakes Pilotage]." *Id.* p. 6, ¶ 23; *id.* at p. 7, ¶ 11.

### The Training Plan Conflicts with the Coast Guard's Regulations

80. The Coast Guard has approved and deferred to the Association's Training Plan even though it conflicts with its own regulations.

13

81. For example, the Coast Guard's regulations do not contemplate an intermediate "Deputy Pilot" status between Applicant Pilot and Registered Pilot. The regulations do not mention a "Deputy Pilot" status or any equivalent.

82. Because of the Deputy Pilot phase, applicants must spend an additional two years (or more) working for the Association, all while finding the time to complete the Minimum Trips Requirement as their workload permits, before qualifying to become a Registered Pilot. In contrast, 46 C.F.R. § 401.220(b)(1) requires that the trips used to complete the Minimum Trips Requirement be completed within one year of application.

83. During the Deputy Pilot phase, the Association requests, and the Coast Guard duly issues, temporary, one-year registrations for Deputy Pilots so that they may work unsupervised on Lake Ontario. However, there are only two provisions, 46 C.F.R. § 401.220(d) and 46 C.F.R. § 401.220(e), that authorize the Coast Guard to issue certificates of registration, and neither authorizes the Coast Guard to register pilots to work during their training.

84. Under 46 C.F.R. § 401.220(d), which the Coast Guard cited when it issued Captain Hight his most recent temporary registration, a pilot who satisfies all of the regulatory requirements shall be issued a "full" five-year registration. That provision does not authorize the Coast Guard to issue a "temporary" one-year registration.

85. Under 46 C.F.R. § 401.220(e), the Coast Guard "may, when necessary to assure adequate and efficient pilotage service, issue a temporary certificate of registration

14

for a period of less than 1 year *to any person found qualified under this subpart regardless of age*" (emphasis added). This provision does not authorize the Coast Guard to issue a temporary registration to applicants who supposedly do not yet qualify for full registration so that they can work as "Deputy Pilots."

86. Instead, 46 C.F.R. § 401.220(e) allows the Coast Guard to address a pilotage shortage by registering otherwise qualified applicants who have reached the maximum age of 70.

87. The Association explicitly states in its Articles of Association that "the term Temporary Certificate of Registration … is not limited to the definition contained at 46 C.F.R. § 401.220(e) dealing with the Director's authority to assure adequate and efficient pilotage service throughout District 1." (Attached as Exhibit B; Art. III § 2(a).)

88. Thus, the Coast Guard is allowing the Association's internal rules, which explicitly discuss temporary registrations beyond what the law authorizes, to supersede federal regulations.

89. Indeed, the Coast Guard has recently acknowledged that its use of temporary registrations at the Association's request is inconsistent with the law. During the Great Lakes Pilotage Advisory Committee's Annual Meeting held on or about September 10, 2018, Director Todd Haviland admitted (obviously in response to Captain Hight's protests) that its policy of issuing Temporary Registrations at the Association's request for its Deputy Pilot stage "doesn't really align with the regulations." (Partial transcript of which is attached as Exhibit C, p. 222.)

90. Further, the Training Plan has apparently been approved by the Coast Guard as the ostensible "course of instruction" contemplated by 46 C.F.R. § 401.220(b)(2) even though it also conflicts with the regulations. Under another provision, 46 C.F.R. § 402.220(b), such a course of instruction must, at a minimum, include instruction in a number of curricular elements, such as "[i]nstruction in basic helm and engine telegraph orders in the Greek, Spanish, German, and Italian languages."

91. However, the Training Plan nowhere mentions instruction in the topics enumerated in 46 C.F.R. § 402.220(b) and, in practice, the Association does not provide any such instruction.

92. Instead of providing instruction, the Training Plan requires applicants to complete a series of trips, which duplicates and adds to the practical experience addressed by the Minimum Trips Requirement.

**The Association Does Not Follow the Training Plan**

93. Not only does the Training Plan not comply with the Coast Guard's regulations, the Coast Guard does not require the Association to comply with its responsibilities under its Training Plan.

94. For example, the Training Plan requires the Association to produce semiannual performance reports for each applicant by August 15th and January 15th of each year, which it must then provide to the applicant and to the Coast Guard. In practice, the Association does not provide such reports and the Coast Guard does not require it to do so.

95. For example, Captain Hight should have received two semiannual performance reports from the Association for the 2016 shipping season; instead, he received none.

96. And Captain Hight should have received two semiannual performance reports from the Association for the 2017 shipping season; instead, he received only one "End of Year Performance Report," which was dated March 6, 2018.

97. And, under the Training Plan, the Association may not terminate an applicant pilot "without the concurrence of the Director."

98. However, the Coast Guard did not enforce this requirement when the Association terminated Captain Hight without waiting for the Director's concurrence, as explained *infra* at ¶¶ 148-152.

### Captain Hight's Progress to Become a Registered Pilot

99. On July 2, 2015, Captain Hight applied for registration as a U.S. Registered Pilot and shortly thereafter began training with the Association.

100. At the time Captain Hight applied to become a Registered Pilot, he held, and still holds, a MMC (that is, a merchant mariner credential), was endorsed as a master, and, during his long maritime career, had acquired well over twenty-four months of service as a credentialed officer on vessels of more than 4,000 gross tons operating on oceans, as required by 46 C.F.R. § 210(a)(1) (*see supra* ¶29).

101. At the time Captain Hight applied to become a Registered Pilot, he had not yet obtained at least six months of service as a licensed or credentialed officer or comparable experience *on the Great Lakes*, as also required by 46 C.F.R. § 401.210(a)(1) for those, like Captain Hight, qualifying with ocean service.

102.    By May 2016, Captain Hight had obtained the necessary six months of experience on the Great Lakes by riding on ships with Association pilots.

103.    Therefore, Captain Hight satisfies the first requirement to qualify as a Registered Pilot, as set by 46 C.F.R. § 401.210(a)(1).

104.    At the Association's direction, between August 2015 and December 2015 Captain Hight completed eight round trips over the designated waters of District One and many more over the undesignated waters of District One in the company of a Registered Pilot within one year of submitting his application to become a Registered Pilot (which he did on July 2, 2015), satisfying the Minimum Trips Requirement described by 46 C.F.R. § 401.220(b)(1) (*see supra* ¶¶ 31-32).

105.    Although Captain Hight only needed to complete five round trips to satisfy the Minimum Trips Requirement since he held, and still holds, a master's license or endorsement, he was erroneously told by the Association that he would ultimately need to complete 12 round trips on the designated waters of District One throughout the course of his training, which is the number of round trips required of an applicant holding a first class pilot's license or endorsement or a third mate's license or endorsement. (Captain Hight later completed four more unnecessary round trips in April 2016.)

106.    Therefore, Captain Hight has completed the Minimum Trips Requirement required by 46 C.F.R. § 401.220(b)(1).

107.    The 2015 shipping season ended in December 2015.

108.    In May 2016, shortly after the beginning of the 2016 shipping season, Captain

Hight advanced from the Applicant Pilot Training Phase of the Training Plan to the

Deputy Pilot Training Phase of the Training Plan.

109.    On May 3, 2016, the Association requested that Captain Hight be temporarily

registered to provide pilotage services on Lake Ontario.

110.    On or around May 3, 2016, the Coast Guard, in response to the Association's

request, issued to Captain Hight a one-year temporary registration for Lake Ontario.

111.    Throughout the 2016 shipping season, Captain Hight provided pilotage services

on Lake Ontario under his temporary registration and continued to complete the

Association's Training Plan.  During this time he actually piloted ships on Lake

Ontario, completing about 100 solo piloting assignments, and was paid a full pilot's

salary, as is customary for Deputy Pilots in the Association.

112.    In March 2017, the Coast Guard renewed Captain Hight's one-year temporary

registration at the Association's request.

113.    Throughout the 2017 shipping season, Captain Hight continued to provide

pilotage services on Lake Ontario under his temporary registration and continued to

complete the Association's Training Plan. He again made a full pilot's salary and

completed about 100 solo assignments.

114.    Additionally, Captain Hight, in his position as a Deputy Pilot, provided

instruction to applicant pilots, signing off and authorizing the training records of the

applicant pilots.

115.    By the end of the 2017 shipping season in December 2017, Captain Hight completed the Training Plan.

116.    During his training, Captain Hight received perfect marks on all of his Pilot Evaluation Cards filled out by the Registered Pilots that observed him during his training trips pursuant to the Association's Training Plan.

117.    The Coast Guard treats the Training Plan as the Course of Instruction described in 46 C.F.R. § 401.220(b) that all applicants seeking to become Registered Pilots in District One waters must complete.

118.    Therefore, Captain Hight has completed the Course of Instruction required by 46 C.F.R. § 401.220(b)(2) (*see supra* ¶ 33), as interpreted by the Coast Guard.

119.    Upon completing the Course of Instruction, Captain Hight satisfied all of the requirements needed to qualify for registration as a Registered Pilot, except the Written Exam required by 46 C.F.R. § 401.220(b)(3).

120.    On January 31, 2018, the Association's President, John Boyce, introduced a ballot measure for Association members to vote on, allowing named applicant pilots who recently completed the Training Plan, including Captain Hight, to restructure their Association buy-in by allowing them to pay part of their buy-in after joining the Association. This was in contemplation of them imminently becoming members in the Association.

121.    The January 31, 2018 ballot measure was approved by the voting members of the Association.

122.    The January 31, 2018 ballot measure is evidence that Captain Hight completed

the Association's Training Plan, that the Association has acknowledged that fact,

and that the Association anticipated that he was about to become a member.

123.    Captain Hight completed the Training Plan to the same extent and to the same

level as the other applicants on the January 31, 2018 ballot measure, each of whom

were subsequently recommended for registration by the Association to the Coast

Guard, received a Certificate of Registration, and became Registered Pilots.

**The Association Recommends Against Captain Hight's Registration**

124.    Shortly before Captain Hight was due to buy into and join the Association in

order to go to work as a Registered Pilot, the Association suddenly and

unexpectedly sent a letter dated March 6, 2018, to the Coast Guard's Director of

Great Lake Pilotage stating that the Association "does not recommend Captain

Hight continue as a Temporarily Registered Pilot and Applicant Pilot in Training on

all District 1 waters for the 2018 season," despite Captain Hight's stellar

performance in completing the Association's Training Plan.

125.    The March 6, 2018 letter was characterized as an "End of Year Performance

Report" for Captain Hight.

126.    This was the first and only such performance report Captain Hight received,

even though the Association's Training Plan requires the Association to prepare

semiannual performance reports for each applicant pilot, give a copy of each report

to the applicant, and forward each report to the Director.

127.    Under the Association's Training Plan, the end-of-year performance report for

each applicant must be submitted to the Director by January 31st each year; Captain

Hight's "End of Year Performance Report," however, was dated March 6, 2018.

128.    The Association did not have a practice of preparing the performance reports

required by their approved Training Plan and the Coast Guard did not require that

the Association do so.

129.    The unusual circumstances surrounding the March 6, 2018, letter reflect the fact

that the letter was a pretext; despite Captain Hight's excellent performance

completing the Training Plan, the President of the Association, John Boyce, did not

want Captain Hight to join the Association and become a Registered Pilot because

Captain Hight had occasionally questioned some of the Association's practices,

policies, and procedures.

130.    Boyce was retaliating against Captain Hight because of questions he had asked

within the Association. For example, he thought it was questionable that Boyce did

not provide the Association's members, including the Association's treasurer, access

to the Association's accounting records.

131.    Captain Hight also has reason to believe that Boyce allowed a Coast Guard

official and his family to stay at the Association's Lake House while on vacation in

the summers of 2016 and 2017. Captain Hight criticized this decision.

132.    Captain Hight challenged these practices, policies, and procedures because he

believed they were not best practices based on his two decades of experience in the

maritime industry.

133.    Captain Hight challenged these practices, policies, and procedures because he believed they were unethical.

134.    Captain Hight challenged these practices, policies, and procedures as a prospective member of the Association who would be required to buy into the Association for around $200,000 and, therefore, had a direct financial interest in the Association's expenditures.

135.    Captain Hight challenged these practices, policies, and procedures as a prospective member of the Association who sought to ensure the Association conducted itself to the highest maritime and ethical standards and to ensure that the Association serves the public welfare and the needs of the maritime community before its own private interests.

136.    Captain Hight's challenges could be perceived as undermining Boyce's authority as President of the Association; therefore, Boyce sought to make an example of Captain Hight to suppress any future dissent by preventing Captain Hight from joining the Association and becoming a Registered Pilot.

137.    Boyce's reaction to Captain Hight' challenges is typical. The Association has a long history, under both Boyce and his predecessors, of retaliating against individuals who question the Association's practices or who seek to become and work as a Registered Pilot without also joining the Association.

138.    Indeed, in a report issued on January 15, 2002, a Coast Guard investigator concluded that the Association's members had "coordinated a deliberate campaign"

to "harass and defame" a pilot who sought to work in District One without being a member of the Association.

139.    To support its recommendation against Captain Hight, the Association cited two incidents involving Captain Hight in the March 6, 2018, letter; these incidents, however, were cited as a pretext.

140.    First, the Association stated that Captain Hight did not file an incident report after a tugboat struck a channel buoy and was damaged while assisting a vessel piloted by Captain Hight on June 11, 2017.

141.    Captain Hight's failure to report the incident is not evidence that he is not fit to become a Registered Pilot. The tugboat was damaged after it had been untethered from Captain Hight's vessel (implying tugboat driver error) and Captain Hight did not learn until days later that it had been damaged. The only indication of the tugboat's troubles Captain Hight had at the time was when, after Captain Hight's vessel cleared the channel, he overheard the driver on the radio stating to another tugboat driver that he was having "trouble" and "experiencing propeller vibration." Captain Hight did not know the tug had been damaged and had no reason to believe this was a reportable incident.

142.    Second, Captain Hight had a heated exchange with the master of a ship Captain Hight piloted on December 15, 2017; during the exchange Captain Hight used some expletives.

143.    However, the Association's reference to this incident is a pretext. That Captain Hight sometimes "curses like a sailor," just as his colleagues often do, does not

24

render him unfit to work as a sailor. In particular, Captain Hight's use of expletives on this occasion is not evidence that he is not fit to become a Registered Pilot. On this occasion, the master was complaining loudly in the background over his radio while Captain Hight was attempting to navigate a vessel into a harbor. The master's loud complaints were distracting and made it difficult for Captain Hight to hear the crew's replies to his helm commands. This created a dangerous situation for the ship, the crew, and anyone in the vicinity. Accordingly, Captain Hight raised his voice and commanded quiet. The master complied and the bridge went silent. After the ship was docked and the crew left the bridge, the master informed Captain Hight that he took offense to Captain Hight's raising his voice for quiet while he was speaking on the radio. During the subsequent exchange, Captain Hight used some expletives while explaining his need for quiet to safely navigate the ship.

144.    These incidents, alone or combined, are not sufficient evidence that Captain Hight is not fit to become a Registered Pilot.

145.    These incidents, alone or combined, would not ordinarily motivate an adverse recommendation from the Association, and only did so in this case because of Boyce's desire to prevent Captain Hight from becoming a Registered Pilot in response to his speech about Association practices, policies, and procedures.

146.    In response to the March 6, 2018, letter, Captain Hight wrote a letter dated March 7, 2018, to the Association explaining these incidents and requesting that the Association reconsider its position.

147.    The Association did not respond to Captain Hight's request.

148.    Instead, the Association blackballed Captain Hight and removed his name from the tour de role.

149.    A pilot, registered or otherwise, cannot be assigned to pilot a vessel without being on the tour de role.

150.    Therefore, by blackballing Captain Hight and removing his name from the tour de role, the Association prevented Captain Hight from continuing to work as a pilot in District One.

151.    On April 11, 2018, the Association's President Boyce introduced an Association ballot to remove Captain Hight from the Association, which then passed.

152.    Through its actions, the Association terminated Captain Hight's "Deputy Pilot" status without the concurrence of the Director of Great Lake Pilotage in direct violation of the Association's approved Training Plan.

### Captain Hight Emails the Coast Guard

153.    After unsuccessfully petitioning the Association to reconsider its March 6, 2018 letter, Captain Hight sent a number of emails to the Coast Guard to contest the Association's recommendation against him.

154.    The Coast Guard, however, repeatedly insisted that Captain Hight was not eligible to become a Registered Pilot without the Association's blessing.

155.    For example, a Coast Guard official, Rajiv Khandpur, explained to Captain Hight that in order for him to be eligible to become a Registered Pilot, the Coast Guard requires "that [the Association] recommend you for full registration as a member of their pilotage pool."

26

156.    On April 11, 2018, the same day the Association terminated him as a Deputy

Pilot, the Coast Guard eventually did renew Captain Hight's *temporary* registration.

157.    This temporary registration, in theory, permitted Captain Hight to pilot ships on

Lake Ontario and earn a full pilot's salary, just as he had during the previous two

shipping seasons; there was nothing legally preventing him from going to work that

was any different from those previous seasons.

158.    However, in practice, the Coast Guard's renewal of Captain Hight's temporary

registration was a meaningless gesture; the Association continued to refuse to add

Captain Hight to the tour de role, and the Coast Guard stated it would not

intervene. For example, in response to Captain Hight's request to the Coast Guard to

be added to the tour de role, Khandpur told Captain Hight: "Regarding being

included in the tour-de-role, that is between you and your pilot association."

159.    The Coast Guard refused to direct the Association to add Captain Hight to the

tour de role even though there was a shortage of active pilots on the District One

tour de role.

160.    The Coast Guard has the legal authority to order the Association to add pilots to

the tour de role and has done so in the past.

161.    During his email exchange with the Coast Guard, Captain Hight reviewed the

Great Lakes Pilotage Act and related regulations and realized that he had completed

all of the requirements for registration except for the Written Exam.

162.   Consequently, he requested that the Coast Guard administer to him the Written
Exam and, upon satisfactory completion of the exam, issue him a "full" (that is, non-
temporary) certificate of registration.

**The Coast Guard Formally Denies Captain Hight's Requests**

163.   On July 18, 2018, the Coast Guard sent to Captain Hight a letter characterized as
a "final determination" denying his request to take the Written Exam. (Attached as
Exhibit D.)

164.   The Coast Guard denied Captain Hight's request because it determined that
Captain Hight had not met "two of the requirements to obtaining full registration"
and it "will not administer the written examination unless these two requirements
are satisfied." *Id.*

165.   First, the Coast Guard claimed that it could not "corroborate" the documentation
Captain Hight provided to demonstrate he had completed the Minimum Trips
Requirement with the information provided by the Association. *Id.*

166.   Second, the Coast Guard insisted that a positive recommendation from the
Association is necessary to qualify as a Registered Pilot.

167.   The Coast Guard informed Captain Hight that he could internally appeal the
decision pursuant to 46 C.F.R. § 1.03-15.

168.   The letter did not respond to Captain Hight's requests to be added to the tour de
role.

169.   The review afforded by 46 C.F.R. § 1.03-15 does not provide for a hearing and is
silent on how a grievant can create a record substantiating his case.

170.    Captain Hight did not know, and had no notice from the Coast Guard, that his emails would be met with a formal denial or that he was creating an administrative record.

171.    Captain Hight was not provided with any opportunity to respond to any of the evidence the Coast Guard considered in deciding against him. This is because he was not given an opportunity to review that evidence or cross-examine those at the Association who provided it to the Coast Guard. Indeed, Captain Hight was not even presented with any such evidence.

172.    Captain Hight did not even receive (and still has not received, despite his requests) a description of the "information" the Association provided to the Coast Guard that supposedly contradicted his evidence documenting that he completed the Minimum Trips Requirement.

173.    On August 15, 2018, Captain Hight timely appealed the Coast Guard's determination pursuant to 46 C.F.R. § 1.03-15.  (Attached as Exhibit E.)

174.    In his appeal, Captain Hight: (1) disputed the Coast Guard's determination that he had not satisfied the Minimum Trips Requirement; (2) argued that the Coast Guard erred in determining that a positive recommendation from the Association is a prerequisite to sit for the Written Exam; (3) reasserted his claim that the Coast Guard has unlawfully denied him the right to earn a living by refusing to direct the Association to add him to the tour de role even though he possessed a temporary registration; and (4) raised a number of constitutional claims, which are taken up on this appeal and discussed in more detail below.

175.    On October 19, 2018, the Coast Guard sent Captain Hight a letter in which it

denied his appeal. (Attached as Exhibit F.)

176.    The October 19, 2018, letter constituted a "final agency action."

177.    First, the Coast Guard concluded that Captain Hight has not completed the

Minimum Trips Requirement.

178.    The Coast Guard agreed that Captain Hight was required to complete five round

trips over District One waters and that he completed 12 round trips between August

2015 and April 2016. (In its October 19, 2018, letter, the Coast Guard found that

Captain Hight completed "twenty-seven, one-way River trips," which corresponds

to 13 rounds trips. The Coast Guard appears to have misread Captain Hight's trip

log. The difference, however, is not material to this case.)

179.    However, the Coast Guard determined that the first eight of Captain Hight's

round trips did not count because they occurred before Captain Hight acquired the

six months of Great Lakes experience necessary to qualify for registration under 46

C.F.R. § 401.210(a)(1), which Captain Hight acquired between July and December

2015.

180.    This is contrary to the Coast Guard's own practice. It has allowed other pilots to

use trips completed during their initial six months of Great Lakes training to satisfy

the Minimum Trips Requirement.

181.    Second, the Coast Guard reiterated its position that a positive recommendation

from the Association is required for an applicant to be eligible to become a

Registered Pilot.

182.    For example, the Coast Guard wrote that "prospective [Registered Pilots] …

        must receive a recommendation by the association before the Coast Guard will grant

        the 'Applicant Pilot' a full registration" and "the pilot registration scheme has been

        premised upon approvals by both the Coast Guard and the association overseeing

        the training of an applicant pilot."

183.    The Coast Guard then reiterated its position that, since, under its interpretation, a

        positive recommendation is required for an applicant to be eligible to become a

        Registered Pilot, a positive recommendation is therefore also required before an

        applicant may sit for the Written Exam.

184.    Therefore, concluded the Coast Guard, since Captain Hight has not received the

        Association's blessing, he is not eligible to take the Written Exam.

185.    Therefore, Captain Hight has not taken the Written Exam required by

        46 C.F.R. § 401.220(b)(3) (*see supra* ¶ 34), only because the Coast Guard refuses to

        allow him to sit for it. Indeed, the Coast Guard's refusal to allow Captain Hight to sit

        for the Written Exam is, in part, the source of this controversy.

186.    In addition, the Coast Guard explicitly declined to consider Captain Hight's

        request to be added to the tour de role and his constitutional claims because,

        according to the Coast Guard, they are "well beyond the limited scope of the matter

        at hand."

187.    Captain Hight preserves his request to be added to the tour de role on appeal.

        Captain Hight repeatedly requested that the Coast Guard direct the Association to

        add him to the tour de role so that he could work under his temporary registration,

but the Coast Guard declined to do so. The Coast Guard has the authority to compel the Association to add registered pilots to the tour de role, despite its suggestions that it does not. The Coast Guard cannot evade review of its decision not to address this request by merely ignoring it.

188.    Captain Hight also preserves his constitutional claims.

189.    Separately from this lawsuit, Captain Hight timely applied to the Coast Guard on December 13, 2018, to renew his temporary registration. He has not heard a response on the status of that application yet, but expects it to be denied based on the Coast Guard's and the Association's past behavior.

### The Unwritten Requirement to Join the Association

190.    Captain Hight's experience demonstrates that the Coast Guard enforces an additional, unwritten requirement that an individual must satisfy before being allowed to work as a Registered Pilot in District One: an applicant must join the Association.

191.    In the first place, an applicant must constantly gain the Association's approval to advance through and complete the Training Plan necessary to become a Registered Pilot.

192.    Indeed, an applicant must actually join the Association as an "Associate Member" to complete the Deputy Pilot phase of the Training Plan, according to the Association's Articles of Association (Exhibit B; Art. III § 2).

193.    Then, even after a pilot has earned a certificate of registration, the pilot must continue to be a member of the Association to actually work as a pilot in District One.

194.    The Coast Guard has delegated control over the tour de role to the Association such that the Association can refuse to dispatch a registered pilot simply because the pilot is not a member of the Association.

195.    In practice, the Association will not add a registered pilot to the tour de role if the pilot is not a member of the Association.

196.    Even the most qualified pilot could be refused membership in the Association; the Association maintains sole authority over who may become a member.

197.    And even with the Association's approval, becoming a member is not trivial. To join, a prospective member must purchase a share in the Association's corporate business arm, Seaway Pilots, Inc.

198.    A share in the Association currently costs about $200,000.

199.    The value of a share in the Association incorporates the value of assets that aren't necessary to provide safe and efficient pilotage services, such as the million-dollar Lake House property the Association purchased in 2016.

**The Association has an Economic Interest in Limiting Registered Pilots**

200.    In addition to regulating pilot registration, the Coast Guard also sets the rate at which Registered Pilots may charge the vessels that must employ their services. 46 U.S.C. § 9303(f).

201.    In 2018, the Coast Guard set pilotage rates based on a target compensation

benchmark of around $350,000 per pilot. (Actual compensation may differ from the

benchmark, depending on the actual demand for Registered Pilots' services.)

202.    By restricting the number of pilots, the Association can create the impression that

the current pilotage rates set by the Coast Guard are too low to recruit and retain a

sufficient number of qualified pilots, thereby convincing the Coast Guard to increase

the rates Association members can charge.

203.    Therefore, the Association and its members have an economic self-interest in

limiting the number of Registered Pilots in District One.

204.    The Association lobbies the Coast Guard for higher pilotage rates and other

policies that financially benefit the Association and its members.

**The Coast Guard has been Captured by the Association**

205.    The Coast Guard has failed to meaningfully oversee pilot registration, despite its

statutory mandate to do so under the Act. Instead of following its own regulations,

the Coast Guard has allowed the Association to commandeer the pilot registration

process.

206.    First, by requiring that applicants receive a positive recommendation from the

Association in order to become a Registered Pilot, the Coast Guard has given the

Association a veto over who may become a Registered Pilot.

207.    But the Association's approval is not required by the regulations. In particular,

46 C.F.R. § 401.220(c) states that the Association "shall submit to the Director in

writing its recommendations together with its reasons for the registration of the

Applicant," and 46 C.F.R. § 401.220(d) states that "[s]ubject to [46 C.F.R. § 401.220(a)-(c)], a pilot found to be qualified under this subpart shall be issued a Certificate of Registration." The plain text of these provisions allows the Coast Guard to exercise its discretion and approve an applicant for registration despite the Association's disapproval.

208.    Second, the Coast Guard has approved and deferred to the Association's Training Plan even though it conflicts with the Coast Guard's own regulations (*see supra* ¶¶ 80-92).

209.    Third, the Coast Guard does not require the Association to comply with its responsibilities under its Training Plan (*see supra* ¶¶ 93-98).

210.    Fourth, as demonstrated by Captain Hight's case, the Coast Guard unquestioningly defers to the Association's account in disputes between the Association and applicants, even in the face of considerable contrary evidence.

211.    For example, Captain Hight provided detailed documentation showing that he completed the trips required by the Minimum Trips Requirement. The Coast Guard rejected this evidence, stating simply that it could not "corroborate" it with the "information" provided by the Association, but did not share this "information" with Captain Hight let alone give him an opportunity to rebut it.

212.    The Coast Guard also stated that the trips from Captain Hight's first six months of training did not count under a strained reading of the regulations, even though their plain text does not exclude these trips.

213.    Indeed, the Coast Guard regularly gives credit for trips in the first six months of
training, even for applicants who do not yet have six months of Great Lakes
experience, if the Association recommends the applicant.

214.    The Association had also recently approved a January 31, 2018, ballot measure
(*see supra* ¶¶ 120-123) related to Captain Hight's imminent buy-in to join the
Association, belying the Association's later assertions that Captain Hight has not
completed the Minimum Trips Requirement or the Training Plan. The Coast Guard,
however, has unquestioningly accepted the Association's changed opinion.

215.    Fifth, the Coast Guard defers to the Association to manage the tour de role, even
when there is a shortage of pilots.

216.    For example, in response to Captain Hight's request to be added to the tour de
role, which he made when there was a shortage of pilots on the tour de role, the
Coast Guard told Captain Hight: "Regarding being included in the tour de role, that
is between you and your pilot association."

217.    To put it simply, the Coast Guard is a victim of "regulatory capture," which
occurs when a regulatory agency, created in the public interest, instead advances the
commercial or political interests of the industry it is charged with regulating.

**Harm to Plaintiff**

218.    Captain Hight has been denied a fair opportunity to obtain the credential he
needs to work as a Registered Pilot because and only because the Association
blackballed him. The Coast Guard has, in practice, granted the Association sole and
unlimited discretion to veto would-be pilots. The Coast Guard's legal positions

36

attempting to justify its refusal to allow Captain Hight to sit for the Written Exam are simply post hoc attempts to justify the Association's unexplained and unreviewable exercise of this unlimited discretion.

219.    After three years of intense training and work, Captain Hight reasonably expected to continue working as a pilot on Lake Ontario and the St. Lawrence River and earning an annual salary. He and his family planned their lives accordingly, including purchasing a house.

220.    Then, in March 2018, suddenly and without warning, Captain Hight lost his only source of income when he was denied his future as a pilot. Several months later he found a new job in a different state, but now makes less than half of the salary he earned and reasonably expected to continue earning.

221.    Unless Captain Hight is provided a fair opportunity to become a Registered Pilot and be placed on the tour de role, he will not be able to earn a living as a pilot on the waters where he trained for three years.

### CLAIMS

**Claim I: The internal procedures the Coast Guard employed to evaluate Captain Hight's grievances violated Captain Hight's right to procedural due process.**

222.    Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

223.    On July 18, 2018, after Captain Hight emailed the Coast Guard to object to his treatment by the Association, the Coast Guard unexpectedly sent Captain Hight a

letter purporting to be a "final determination" denying his requests to take the Written Exam and, through the letter's silence, be placed on the tour de role.

224.    The letter informed Captain Hight that he could internally appeal the decision within 30 days pursuant to 46 C.F.R. § 1.03-15.

225.    Captain Hight was not provided with any opportunity to respond to any of the evidence the Coast Guard considered in deciding against him. This is because he was not given an opportunity to review that evidence or cross-examine those at the Association who provided it to the Coast Guard. Indeed, Captain Hight was not even presented with any such evidence.

226.    Captain Hight did not even receive (and still has not received, despite his requests) a description of the "information" the Association provided to the Coast Guard that supposedly contradicted his evidence documenting that he completed the Minimum Trips Requirement.

227.    Captain Hight had no opportunity to respond to the Coast Guard's secret, *ex parte* discussions with the Association.

228.    Therefore, Captain Hight did not receive an adequate opportunity to build a record in support of his claims before the agency.

229.    Rather than being decided by a judicial or quasi-judicial officer, Captain Hight's claims were informally addressed by at-will Coast Guard employees through email and written correspondence.

230.    Therefore, Captain Hight did not receive an adequate opportunity to be heard.

231.    A lack of adequate notice, opportunity to be heard, or procedural safeguards is

inconsistent with procedural due process.

232.    Therefore, the procedures the Coast Guard employed to evaluate Captain

Hight's claims violated Captain Hight's right to procedural due process under the

Due Process Clause of the Fifth Amendment.

233.    Defendants' actions, findings, and conclusions are contrary to constitutional

right, power, privilege, and immunity and without observance of procedure

required by law under 5 U.S.C. § 706(2)(B), (D).

**Claim II: The Coast Guard's novel interpretation of the Minimum Trips Requirement of 46 C.F.R. § 401.220(b)(1) should be held unlawful and it should be set aside accordingly.**

234.    Plaintiff realleges and incorporates by reference each and every allegation set

forth in paragraphs 1 through 233 above.

235.    To qualify to become a Registered Pilot, an applicant must "complete[] the

minimum number of trips prescribed by the Commandant over the waters for which

application is made on oceangoing vessels, in company with a Registered Pilot,

within 1 year of date of application." 46 C.F.R. § 401.220(b).

236.    The Coast Guard has prescribed that an applicant holding a master's license or

endorsement, like Captain Hight, must complete a minimum of five round trips

over the waters for which registration is required to satisfy the Minimum Trips

Requirement. 46 C.F.R. § 402.220(a)(1).

237.    Between August 2015 and December 2015 Captain Hight completed eight round

trips over District One waters on oceangoing vessels in the company of a Registered

Pilot within one year of submitting his application to become a Registered Pilot in order to satisfy the Minimum Trips Requirement described by 46 C.F.R. § 401.220(b).

238.    The Coast Guard acknowledges that Captain Hight completed these trips.

239.    However, the Coast Guard concluded that Captain Hight has not satisfied the Minimum Trips Requirement because many of his trips occurred while he was also training with the Association to acquire the six months of Great Lakes experience separately needed to qualify for registration under 46 C.F.R. § 401.210(a)(1).

240.    However, the plain text of 46 C.F.R. § 401.220(b)(1) requires only that the trips be completed "on oceangoing vessels, in company with a Registered Pilot, within 1 year of date of application"; it does not also require that such trips be completed after obtaining the six months of Great Lakes experience separately required by 46 C.F.R. § 401.210(a)(1).

241.    Indeed, the Coast Guard's sudden, novel interpretation of 46 C.F.R. § 401.220(b)(1) is inconsistent with its practice.

242.    First, the Coast Guard has allowed other pilots to use trips completed during their initial six months of Great Lakes training to satisfy the Minimum Trips Requirement.

243.    Second, shortly after the 2017 shipping season ended, the Association President introduced a ballot measure on January 31, 2018, contemplating Captain Hight's imminent buy-in to join the Association, strongly suggesting that the Association, despite its later representations to the Coast Guard, believed Captain Hight had

successfully completed the Minimum Trips Requirement as the Coast Guard had, until now, interpreted that requirement.

244.    Therefore, the evidence demonstrates that the Coast Guard has only adopted this interpretation on appeal as a pretext to deny Captain Hight's appeal.

245.    The Coast Guard's interpretation of the Minimum Trips Requirement of 46 C.F.R. § 401.220(b)(1) is therefore unlawful and should be set aside because it is: (a) arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; (b) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and (c) without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

246.    Captain Hight preserves for appeal the argument that the doctrine of deference to agency interpretations under *Auer v. Robbins*, 519 U.S. 452 (1997), is unconstitutional and in violation of the Administrative Procedure Act.

**Claim III: The Coast Guard's position that Captain Hight must obtain a positive recommendation from the Association to sit for the Written Exam and become a Registered Pilot under 46 C.F.R. §§ 401.220(b),(c) should be held unlawful and it should be set aside accordingly.**

247.    Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 246 above.

248.    Once an applicant completes the Minimum Trips Requirement, the Course of Instruction, and the Written Exam described in 46 C.F.R. § 401.220(b), the pilot association authorized to establish a pilotage pool in which the applicant qualifies for registration must submit to the Coast Guard's Director of Great Lakes Pilotage in

writing "its recommendations together with its reasons for the registration of the applicant." 46 C.F.R. § 401.220(c).

249.    The Coast Guard denied Captain Hight's request to take the Written Exam required by 46 C.F.R. § 401.220(b)(3), in part because, according to the Coast Guard, a positive recommendation from the Association under 46 C.F.R. § 401.220(c) is required *before* an applicant may sit for the Written Exam, and Captain Hight has not received a positive recommendation from the Association.

250.    By its plain text, 46 C.F.R. § 401.220(c) requires the Association to "submit to the Director in writing its recommendations" for an "Applicant Pilot [who] has qualified for registration under [46 C.F.R. § 401.220(b)]." In order to qualify for registration under 46 C.F.R. § 401.220(b), an applicant must have *already* completed the Written Exam. Therefore, an applicant must satisfactorily complete the Written Exam *before* the Association is even called upon to submit a recommendation, and the Coast Guard has it backwards when it insists that an applicant may instead take the written exam *only after* the Association issues a (positive) recommendation.

251.    Indeed, the regulations do not require a *positive* recommendation at all before an applicant can become a Registered Pilot. The plain text of 46 C.F.R. § 401.220(c) and 46 C.F.R § 401.220(d) allows the Coast Guard to exercise its discretion and approve an applicant for registration despite the Association's disapproval.

252.    Further, the Coast Guard's interpretation would be unconstitutional, because it would delegate to a private, self-interested business organization an absolute veto over pilot registration (*see infra* Claim V).

253.     The Coast Guard's interpretation of 46 C.F.R. § 401.220(c) is therefore unlawful

and should be set aside because it is: (a) arbitrary, capricious, an abuse of discretion,

and otherwise not in accordance with law; (b) in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right; and (c) without observance of

procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

254.     Captain Hight preserves for appeal the argument that the doctrine of deference

to agency interpretations under *Auer v. Robbins*, 519 U.S. 452 (1997), is

unconstitutional and in violation of the Administrative Procedure Act.

**Claim IV: The Coast Guard's requirement that Captain Hight must join a "voluntary" association to work as a Registered Pilot in District One is not a correct interpretation of the Great Lakes Pilotage Act.**

255.     Plaintiff realleges and incorporates by reference each and every allegation set

forth in paragraphs 1 through 254 above.

256.     The Association is a "voluntary association" approved under 46 U.S.C. § 9304(a)

of the Great Lakes Pilotage Act.

257.     Under the Coast Guard's interpretation of the Great Lakes Pilotage Act, its

interpretation of the regulations it promulgated to implement that Act, and its

practice, the Coast Guard requires that an individual join the Association in order to

work as a Registered Pilot.

258.     The Coast Guard has told Captain Hight that his "being included in the tour de

role" so that he can work using his temporary registration "is between [him] and

[the Association]."

259.    The result of the Coast Guard's position is a requirement that a Registered Pilot must join the Association to be added to the tour de role; because of the Coast Guard's position, working as a Registered Pilot in District One is not feasible without joining the Association.

260.    In other words, despite the clear meaning of the word "voluntary," the Coast Guard says Captain Hight *must* join the Association to work as a pilot in District One.

261.    However, this is not a correct, or even a reasonable, interpretation of 46 U.S.C. § 9304(a).

262.    The word "voluntary" cannot be interpreted to mean "mandatory," which is an antonym of the word "voluntary."

263.    The Coast Guard's interpretation of 46 U.S.C. § 9304(a) is therefore unlawful and should be set aside because it is: (a) arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; (b) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and (c) without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

264.    Captain Hight preserves for appeal the argument that deference under *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984), under which the court may decide to defer to the agency's interpretation of a statute even if it is not the best interpretation, is unconstitutional.

**Claim V: The Coast Guard has delegated its licensing power to a private, self-interested business organization in violation of the Due Process Clause.**

265.   Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 264 above.

266.   The Coast Guard is a federal government agency responsible under the Great Lakes Pilotage Act for licensing pilots on Lake Ontario and the St. Lawrence River.

267.   The Coast Guard has, through its regulations and practices, delegated its authority to decide who may become and work as a Registered Pilot in District One to the Association by requiring applicants to complete the Association's Training Plan even though it directly conflicts with the Coast Guard's own regulations, by giving the Association a veto over applicants seeking registration, and by giving the Association primary authority to manage the tour de role.

268.   The Association is an economically self-interested, private business organization.

269.   The federal government and its agencies may not delegate their licensing authority to an economically interested private party; doing so violates the Due Process Clause of the Fifth Amendment.

270.   Defendants' actions, findings, and conclusions are contrary to constitutional right, power, privilege, and immunity under 5 U.S.C. § 706(2)(B).

**Claim VI: The Coast Guard has delegated its licensing power to a private business organization in violation of the Vesting Clause of Article I of the U.S. Constitution.**

271.   Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 270 above.

272.    The Coast Guard is a federal government agency responsible under the Great Lakes Pilotage Act for licensing pilots on Lake Ontario and the St. Lawrence River.

273.    The Coast Guard has, through its regulations and practices, delegated its authority to decide who may become and work as a Registered Pilot in District One to the Association.

274.    The Association is an economically interested private business organization.

275.    Congress may not delegate the federal government's licensing authority to an economically interested private party; doing so violates the Vesting Clause of Article I, Section 1.

276.    Defendants' actions, findings, and conclusions are contrary to constitutional right, power, privilege, and immunity under 5 U.S.C. § 706(2)(B).

**Claim VII: The Coast Guard has delegated its licensing power to a private business organization in violation of the Vesting Clause of Article II of the U.S. Constitution.**

277.    Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 276 above.

278.    The Coast Guard is a federal government agency responsible under the Great Lakes Pilotage Act for licensing pilots on Lake Ontario and the St. Lawrence River.

279.    The Coast Guard has, through its regulations and practices, delegated its authority to decide who may become and work as a Registered Pilot in District One to the Association.

280.    The Association is an economically interested private business organization.

281.    The President and his agencies may not delegate the federal government's licensing authority to an economically interested private party; doing so violates the Vesting Clause of Article II, Section 1.

282.    Defendants' actions, findings, and conclusions are contrary to constitutional right, power, privilege, and immunity under 5 U.S.C. § 706(2)(B).

**Claim VIII:  The Coast Guard's requirement that Captain Hight join the Association to work as a Registered Pilot in District One violates the First Amendment.**

283.    Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 282 above.

284.    Under the Coast Guard's interpretation of the Great Lakes Pilotage Act, its interpretation of the regulations it promulgated to implement that Act, and its practice, the Coast Guard requires that an individual join the Association in order to become a Registered Pilot.

285.    Captain Hight does not wish to associate with the Association as a member.

286.    Captain Hight does not wish to join the Association because he believes the Association is engaged in lobbying and business activities he believes are unethical.

287.    For example, Captain Hight believes that the Association has, among other things, provided gifts of lodging, transportation, and meals to a Coast Guard official in order to influence that official; Captain Hight has previously voiced his concerns regarding this issue to the Coast Guard.

288.    In particular, Captain Hight believes that the Association allowed a Coast Guard official and his family to stay at the Association's Lake House free of charge.

47

289.    The requirement that Captain Hight join a private association he believes is

engaged in lobbying and business activities with which he disagrees in order to

work as a Registered Pilot violates his First Amendment right to refuse to associate.

290.    Further, to join the Association, Captain Hight would need to "buy in" to the

Association by purchasing a share in the Association costing around $200,000.

291.    Captain Hight's buy-in could be used to fund the activities Captain Hight finds

objectionable; for example, the funds could be used to maintain the Lake House

Captain Hight believes is improperly lent to the Coast Guard official.

292.    The cost of a share in the Association is calculated as the value of the

Association's assets, including the Lake House, divided by the number of members;

therefore, in order for Captain Hight to become a Registered Pilot the Coast Guard

requires that he must, in effect, purchase a stake in an expensive lake house he

believes is being used by the Association to lobby the Coast Guard.

293.    The requirement that Captain Hight help fund a private association he

reasonably believes is engaged in lobbying and business activities with which he

disagrees in order to work as a Registered Pilot violates his First Amendment right

to be free from compelled speech and association.

294.    Defendants' actions, findings, and conclusions are contrary to constitutional

right, power, privilege, and immunity under 5 U.S.C. § 706(2)(B).

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Honorable Court issue a

judgment in Plaintiff's favor and

a. Issue a declaratory judgment, both under the Administrative Procedure Act and, independently, under 28 U.S.C. § 2201 that

    i. The Coast Guard violated Plaintiffs' procedural due process rights in denying his administrative appeal without providing him the materials the Coast Guard was reviewing or allowing Plaintiff a chance to create an adequate record;

    ii. Plaintiff satisfies the Minimum Trips Requirement of 46 C.F.R. § 401.220(b)(1);

    iii. Neither the Act nor the Coast Guard regulations interpreting the Act require a positive recommendation from a pilot association for an applicant to become a Registered Pilot;

    iv. In the alternative, if the Act or the regulations do require a positive recommendation from a pilot association for an applicant to become a Registered Pilot, the requirement is an unconstitutional private delegation which violates the Due Process Clause of the Fifth Amendment to the United States Constitution;

    v. In the alternative, if the Act or the regulations do require a positive recommendation from a pilot association for an applicant to become a Registered Pilot, the requirement is unconstitutional under the Vesting Clause of Article I, Section 1 of the United States Constitution;

    vi. In the alternative, if the Act or the regulations do require a positive recommendation from a pilot association for an applicant to become a Registered Pilot, the requirement is unconstitutional under the Vesting Clause of Article II, Section 1 of the United States Constitution;

    vii. The Coast Guard's practices and policies that, in effect, require an individual to join a pilot association in order to become a Registered Pilot are inconsistent with the Act and the Coast Guard regulations interpreting the Act;

    viii. In the alternative, to the extent that the Act or regulations allow the Coast Guard to require an individual to join a pilot association in order to become a Registered Pilot, the Act or regulations violate the First Amendment to the United States Constitution;

    ix. The Act and the Coast Guard regulations interpreting the Act do not allow the Coast Guard to delegate control over the tour de role to the Association such that the Association can refuse to dispatch a registered pilot simply because the pilot is not a member of the Association;

    x. In the alternative, if the Act or regulations do allow the Coast Guard to delegate control over the tour de role to the Association such that the Association can refuse to dispatch a registered pilot simply because the pilot is not a member of the Association, the delegation is an unconstitutional private delegation which violates the Due Process Clause of the Fifth Amendment to the United States Constitution;

    xi.  In the alternative, if the Act or regulations do allow the Coast Guard to delegate control over the tour de role to the Association such that the Association can refuse to dispatch a registered pilot simply because the pilot is not a member of the Association, the delegation is unconstitutional under the Vesting Clause of Article I, Section 1 of the United States Constitution;

    xii.  In the alternative, if the Act or regulations do allow the Coast Guard to delegate control over the tour de role to the Association such that the Association can refuse to dispatch a registered pilot simply because the pilot is not a member of the Association, the delegation is unconstitutional under the Vesting Clause of Article II, Section 1 of the United States Constitution;

    xiii.  In the alternative, to the extent that the Act or regulations do allow the Coast Guard to delegate control over the tour de role to the Association such that the Association can refuse to dispatch a registered pilot simply because the pilot is not a member of the Association, the Act or regulations violate the First Amendment to the United States Constitution;

b. Order Defendants to

    i.  Allow Plaintiff to sit for the Written Exam;

    ii.  If Plaintiff passes the exam, issue him a Certificate of Registration pursuant to 46 C.F.R. § 401.220(c);

    iii.  Direct the Association to add Plaintiff to the tour de role for District One so that he may work under current and future temporary registrations;

    iv.  Once he becomes a Registered Pilot with a five-year Certificate of Registration, add him to the tour de role for District One;

    v.  Cease and desist from allowing the Association to veto Plaintiff's application to become a Registered Pilot;

    vi.  Cease and desist from requiring Plaintiff to, in effect, join the Association in order to qualify to become a Registered Pilot; and

    vii.  Cease and desist from requiring Plaintiff to, in effect, join the Association in order to work as pilot in District One;

c. Hold unlawful and set aside the Coast Guard's July 18, 2018 and October, 19 2019 decisions;

d. Award Plaintiff reasonable costs and attorney's fees; and

e. Grant such other relief as the Court deems appropriate.

Date: March 6, 2019                    Respectfully submitted,

**Justin M. Pearson**
Justin M. Pearson (Fla. Bar No. 597791)
Email: jpearson@ij.org
INSTITUTE FOR JUSTICE
2 South Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel:    (305) 721-1600
 Fax:   (305) 721-1601

Anthony B. Sanders (Minn. Bar No. 0387307)*
Email: asanders@ij.org
INSTITUE FOR JUSTICE
520 Nicollet Mall, Suite 550
Minneapolis, MN 55402
Tel:    (612) 435-3451
Fax:    (612) 435-5875

Ben Rump (D.C. Bar No. 1618504)*
Email: brump@ij.org
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 2203
Tel:    (703) 682-9320
Fax:    (703) 682-9321

*Attorneys for Plaintiff Matthew J. Hight*

*\*Applications for admission pro hac vice to be filed*